The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

National Cable Television Association, Inc., Intervenor–Defendant.

Civ. No. 92–1751–A.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 24, 1993.

Wiley R. Wright, Jr., Hazel & Thomas, P.C., Alexandria, VA, John Thorne, Michael E. Glover, Washington, DC, Laurence H. Tribe, Jonathan Massey, Cambridge, MA, Robert A. Levetown, Arlington, VA, Mark C. Hensen, Johnson & Gibbs, Washington, DC, Kenneth W. Starr, Paul T. Cappuccio, Christopher Landau, Kirkland & Ellis, Washington, DC, for plaintiffs.

Theodore C. Hirt, James J. Gilligan, Sarah L. Wilson, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendants.

Bruce D. Sokler, Peter Kimm, Jr., Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, DC, for intervenor-defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

#### A.

Plaintiffs in this case, Chesapeake and Potomac Telephone Company of Virginia ("C &

P") and Bell Atlantic Video Services Company ("BVS"), both wholly-owned subsidiaries of Bell Atlantic Corporation, challenge the constitutionality under the First Amendment of certain provisions of the Cable Communications Policy Act of 1984 (the "1984 Cable Act"), 47 U.S.C. § 521, *et seq.* Specifically, plaintiffs challenge subsections (1) and (2) of 47 U.S.C. § 533(b) ("§ 533(b)"), which prohibit telephone companies, and their affiliates, from providing video programming to subscribers within their service areas.[1]

C & P provides local wireline telephone exchange and exchange access service in portions of Virginia, including the City of Alexandria. It is, without dispute, a common carrier subject to subchapter II of the Communications Act, and therefore subject to § 533(b). BVS is an affiliate of C & P, incorporated in Virginia on September 24, 1992, for the purpose of providing video programming to the public. C & P represents that, in the absence of § 533(b), it would enhance its telephone network in Alexandria to have the capability to carry video programming. *See* Affidavit of Richard A. Alston, C & P's Vice President of Operations & Engineering, at 1. The resulting network would have the capacity to provide several hundred channels of video programming to C & P's telephone subscribers. *Id.* at 2. C & P would make these facilities available to its affiliate, BVS, and to other video programmers under tariff on a common carrier basis. *Id.* The parties agree that existing fiber optic technology is capable of providing telephone service and transmitting video programming on an integrated basis directly to subscribers. Joint Stipulation of Facts ¶ 3.

In 1992, C & P contacted the City of Alexandria government about the possibility of obtaining a cable television franchise to compete with the existing cable television operator, Jones Intercable. Alexandria's city attorney responded that, in light of § 533(b), the city would not "be in a position to grant any such franchise." Letter of Philip G. Sunderland, City Attorney, City of Alexandria, to J. Howard Middleton, Jr., Hazel & Thomas (Feb. 17, 1993). The city attorney also stated that "the city would be in a position to process a franchise application from C & P were the video programming prohibition in 47 U.S.C. 533(b) removed." *Id.* Alexandria's mayor has submitted an affidavit indicating her support of C & P's proposal, and indicating that, absent § 533(b), C & P's application for a cable television franchise would receive the same consideration as would be accorded any other applicant. *See* Affidavit of Patricia S. Ticer at 2.

Plaintiffs filed the complaint in the instant action on December 17, 1992, challenging § 533(b) as violative of the First Amendment of the United States Constitution, both facially and as applied to their proposed provision of video programming in the City of Alexandria. Because this is a constitutional challenge to a federal statute, plaintiffs have named as defendants the United States of America, the Federal Communications Commission (the "Commission") and William P. Barr, in his official capacity as Attorney General of the United States [2] (collectively, the "government"). On motion, the National Cable Television Association, Inc. ("NCTA") was permitted to intervene in support of the statute's constitutionality. NCTA accordingly participated in virtually every phase of the litigation, including submission of briefs, preparation of the stipulation of facts, and presentation of oral argument. Less extensive was the participation of thirty-three *am-*

---

**1.** Section 533(b) provides in relevant part:

(1) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.

(2) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide channels of commu-

nications or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the telephone service area of the common carrier.

**2.** By a *sua sponte* Order of the Court, Janet Reno has been substituted for William Barr.

*ici curiae,*[3] who were limited to submission of briefs.

After pursuing some formal discovery, the parties, at the Court's invitation, explored the possibility of submitting the matter to the Court on cross-motions for summary judgment by completing discovery informally and cooperatively and undertaking to prepare a joint stipulation of facts. The effort bore fruit. The matter is now before the Court on cross-motions for summary judgment based on a comprehensive stipulation of facts and a supporting record consisting of several thousand pages of affidavits, exhibits, and briefs. Indeed, it is difficult to imagine a more complete record, and it is hard to see how the Court's disposition of the dispute on this record can reasonably be labeled as "summary."

### B.

Although § 533(b) was enacted as part of the 1984 Cable Act, telephone companies have been prohibited from providing cable television service since the early years of the cable television industry. Section 533(b) had its genesis in a similar restriction imposed by the Commission in 1970. At that time, the cable television industry was in its infancy and was referred to as community antenna television service ("CATV"). The then-existing technology entailed building large antennas in rural areas and other places unable to receive clear television signals over the air, and stringing cables, often on electric utility or telephone poles, from the central antenna to the CATV customers. In 1968, the Commission ruled that telephone companies must obtain certification pursuant to § 214 of the Communications Act, 47 U.S.C. § 214, prior to constructing, acquiring or operating facilities to provide "channel service" to cable television companies.[4] Because the resulting § 214 applications revealed varying degrees of ownership affiliation between telephone companies and cable television operators, the Commission initiated a rule-making proceeding to ascertain whether telephone companies, either directly or through affiliates, should be permitted to provide cable television service to the public.[5] As a result of this proceeding, the Commission concluded that telephone companies and their affiliates should be precluded, absent specific exemption, from providing cable television service within their local telephone service areas.[6]

---

**3.** The *amici curiae* are: National Association of Broadcasters; Association of Independent Television Stations, Inc.; Tribune Broadcasting Company; Citizens for a Sound Economy Foundation; American Legislative Exchange Council; United States Telephone Association; Ameritech; BellSouth Corporation; Contel of Virginia, Inc. d/b/a GTE Virginia; GTE Service Corporation; NYNEX Corporation; Pacific Telesis Group; Rochester Telephone Corporation; Southwestern Bell Corporation; US WEST Inc.; Consumer Federation of America; Virginia Citizens Consumer Council; Newspaper Association of America; Virginia Press Association; METS Fans United/Virginia Consumers for Cable Choice; Alexandria Federation of Civic Associations, Inc.; Virginia State Conference NAACP; Virginia Association for the Deaf; Northern Virginia Resource Center for Deaf and Hard of Hearing Persons; Virginia Public Interest Coalition; Men's Senior Baseball League; Harlem Consumer Education Council; Pennsylvania Institute for Community Services; Mobile Community Action, Inc.; Self Help Action of Chicago; American Council of Consumer Awareness, Inc.; Colorado River Community Action Council; and New Opportunities for Waterbury, Inc.

**4.** *See General Telephone Co. of California,* 13 F.C.C.2d 448 (1968), *aff'd sub nom. General Telephone Co. of California v. FCC,* 413 F.2d 390 (D.C.Cir.), *cert. denied,* 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969).

> Section 214 provides in relevant part:
> No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line....

47 U.S.C. § 214(a).

**5.** *See Applications of Telephone Common Carriers for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems (Notice of Proposed Rule Making),* 34 Fed.Reg. 6290 (1969).

**6.** *See Applications of Telephone Common Carriers for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems (Final Report and Order)* (the "1970 Order"), 21 F.C.C.2d 307 (1970), *recons. in part,* 22 F.C.C.2d 746 (1970), *aff'd sub nom. General Telephone Co. of the Southwest v. United*

The Commission based its ruling on a finding that the telephone companies had the potential to discriminate against independent CATV providers, in favor of telephone company affiliates, in granting access to telephone poles for attachment of the CATV cables.[7]

In 1978, Congress passed the Pole Attachment Act, which authorized the Commission to "regulate the rates, terms, and conditions for pole attachments." 47 U.S.C. § 224(b)(1). Although this legislation addressed cable operators' fears of discriminatory pricing for pole attachments, the legislation is, by its terms, applicable only if access to poles is actually granted by the owner; it does not mandate such access. *See FCC v. Florida Power Corp.*, 480 U.S. 245, 251, 107 S.Ct. 1107, 1111, 94 L.Ed.2d 282 (1987). Thus, the Pole Attachment Act only partially allayed the Commission's concerns regarding cable operators' access to telephone poles and conduit space.

In 1980, the Commission directed its staff to conduct a study of the Commission's cable television cross-ownership policies. This directive culminated in the issuance of a report by the FCC Office of Plans and Policy in November 1981, entitled *FCC Policy on Cable Ownership, A Staff Report* (the "OPP Report"). The OPP Report considered alternatives to the then-existing Commission policy against telephone company provision of cable television, but concluded by advising that the restriction "must be retained for the time being." OPP Report at 143. The report, while acknowledging that "the problem of pole access" would no longer "by itself" justify the restriction, *id.* at 162, found that additional concerns, noted but not relied upon by the Commission when it had originally implemented the ban, continued to militate against removing the restriction. Chief among these concerns was "cross-subsidization," namely the possibility that telephone companies operating cable television facilities would hide cable costs in their telephone rate

bases. Such cross-subsidization "allow[s] a telephone company partially to avoid rate-of-return regulation on its telephone service ... by attributing costs to the regulated telephone division and revenues to an unregulated cable division." *Id.* at 153. Unchecked, this practice would lead to higher telephone rates and supra-competitive profits for the telephone companies. *Id.* at 158. Such profits, in turn, could be used to underprice competing cable television operators, forcing them out of business, thereby enabling the telephone companies to leverage their regulated local exchange monopoly into an additional monopoly of video transmission services. The Commission took no formal action following release of the OPP Report either to approve or reject the report. The Commission's restriction on telephone companies' provision of cable television within their service areas was retained without modification.

In 1984, Congress passed the 1984 Cable Act, which includes the provisions at issue in this case. Section 533(b) was adapted directly from the regulations established by the Commission's 1970 Order, with the exception that where the Commission had prohibited telephone company provision of "CATV service," the new law prohibited provision of "video programming," defined as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. § 522(19). Congress also included, as had the Commission's regulations, a rural exemption and waiver authority for the Commission. *See* 47 U.S.C. § 533(b)(3) and (4).

Legislative materials relating to § 533(b) are sparse. No legislative findings of fact accompanied the provisions. The sole specific reference to § 533(b) in the legislative history of the 1984 Cable Act is a passage in the House Committee Report, which indicates that the intent of the provision was "to codify current FCC rules concerning the provision of video programming over cable sys-

States, 449 F.2d 846 (5th Cir.1971). Significantly, the court challenge to the 1970 Order did not involve a First Amendment claim.

7. *See* 1970 Order, 21 F.C.C.2d at 324. ("[T]he monopoly position of the telephone company in the community [results in] effective control of the pole lines (or conduit space) required for the construction and operation of CATV systems. Hence, the telephone company is in an effective position to preempt the market for this service....").

tems by common carriers...." H.R.Rep. No. 934, 98th Cong., 2d Sess. 56 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4693. The report indicates that § 533 as a whole, which also includes a prohibition on cross-ownership between television stations and cable systems in the same geographical area (and, in the version of the bill reported by the House of Representatives but not in the final version of the statute, a provision preventing cross-ownership between daily newspapers and cable systems in the same geographical area) was intended "to prevent the development of local media monopolies, and to encourage a diversity of ownership of communications outlets." *Id.* at 55, U.S.Code Cong. & Admin.News 1984, p. 4692.

In August 1986, less than two years after Congress enacted § 533(b), the Commission directed its Common Carrier Bureau to prepare a notice of inquiry "on the question of the restriction on cable ownership placed on local exchange telephone companies." 1 FCC Rcd. 864, 897 (1986). A formal Notice of Inquiry was issued a year later, *In re Telephone Company—Cable Television Cross–Ownership Rules (Notice of Inquiry),* 2 FCC Rcd. 5092 (1987), and was followed by a Further Notice of Inquiry and Notice of Proposed Rulemaking released in September 1988. *In re Telephone Company—Cable Television Cross–Ownership Rules (Further Notice of Inquiry and Notice of Proposed Rulemaking)* (the "FNOI"), 3 FCC Rcd. 5849 (1988). In the FNOI, the Commission tentatively concluded that it should recommend to Congress that § 533(b) be eliminated.

In August 1992, after soliciting a further round of comments, the Commission finally acted on its tentative conclusion, recommending formally to Congress "that it amend the Cable Act to permit the local telephone companies to provide video programming directly to subscribers in their telephone service areas, subject to appropriate safeguards." *In re Telephone Company—Cable Television Cross–Ownership Rules (Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking)* (the "Video Dialtone Order"), 7 FCC Rcd. 5781, 5847 (1992). The Commission concluded that "the risks of anticompetitive conduct by the local telephone companies in connection with the direct provision of video programming have been attenuated by the enormous growth of the cable industry," with the result that "any remaining risk of anticompetitive conduct by the local telephone companies is outweighed by the potential public interest benefits their entry would bring." *Id.* at 5848–49. As a consequence, the Commission found that elimination of § 533(b) would "promote our overarching goals in this proceeding by increasing competition in the video marketplace, spurring the investment necessary to deploy an advanced infrastructure, and increasing the diversity of services available to the public." *Id.* at 5847.[8]

Throughout the period the Commission was considering the issue of telephone company entry into the cable television business, Congress itself was devoting extensive attention to the matter. Repeal of § 533(b) has been considered in numerous Congressional hearings,[9] and proposals to eliminate the

---

**8.** Ironically, despite the fact that the Department of Justice is the principal litigant defending the validity of § 533(b) in this proceeding, the Department's Antitrust Division also supports repeal of the provision. *See* Reply Comments of the United States Department of Justice, *In re Telephone Company—Cable Television Cross–Ownership Rules,* CC Docket No. 87–266, p. 44 ("The Department believes that LECs [local exchange carriers] should be allowed to own and directly provide video programming."). Another federal agency, the National Telecommunications and Information Administration ("NTIA") of the Department of Commerce has reached the same conclusion. *See,* Comments of NTIA, *In Re Tele-*

*phone Company—Cable Television Cross–Ownership Rules,* CC Docket No. 87–266, pp. 2–3.

**9.** *See Cable Instructional TV and S. 1200 Communications Competitiveness and Infrastructure Modernization Act of 1991: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science and Transportation,* 102d Cong., 2d Sess. (February 28, 1992); *Cable TV Consumer Protection Act of 1991: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science and Transportation,* 102d Cong., 1st Sess. (March 14, 1991); *Cable Television Regulation: Hearings Before the Subcomm. on Telecommunications and*

statute have appeared in six separate bills since 1989.[10] To date, Congress has declined to modify the provision, despite the recommendation of the Commission, and despite the interim passage of the Cable Television Consumer Protection and Competition Act of 1992 (the "1992 Cable Act"), which comprehensively revised regulation of the cable television industry. The Senate Report accompanying the 1992 Cable Act expressly affirmed the · Committee's belief that the § 533(b) ban "enhance[d] competition." *See* S.Rep. No. 92, 102d Cong., 1st Sess. 18 (1991), U.S.Code Cong. & Admin.News 1992, pp. 1133, 1150.

### C.

Cable television has changed dramatically since the Commission originally banned telephone companies from participation in the industry in 1970. At that time, CATV reached only approximately 9% of all homes and mainly consisted of small, limited capacity systems in remote communities. *See* Video Dialtone Order, 7 FCC Rcd. at 5848; Joint Stipulation of Facts ¶ 17. Now, cable television is available to over 96% of the nation's homes, and approximately 60% of the television households subscribe. *Id.*

Cable systems carry both the programming of broadcast television stations and programming made by or directly marketed to cable operators. In recent years, the amount of non-broadcast video programming has increased markedly. As of 1992, there were 78 national cable networks, up from only four in 1976. Joint Stipulation of Facts ¶ 9. Cable systems nationwide currently have an average capacity of about 40 channels. *Id.* at

¶ 20. As the parties have stipulated, "the supply of available video programming exceeds the available channel capacity of almost all cable systems." *Id.* at ¶ 19.

Companies operating cable television systems have grown rapidly, commensurate with the growth of the industry. According to the Census Bureau, annual cable operator revenues were $345 million in 1970. *Id.* at ¶ 27. By 1992, annual revenues of the industry topped $21 billion. *Id.* Many cable systems serving individual communities are owned by large, national or regional chains known as multiple system operators ("MSOs"). The five largest MSOs combined to serve over 40% of all cable subscribers. *Id.* at ¶ 29. The largest MSO, Tele–Communications, Inc., served 9.6 million cable subscribers in 1991 and had revenues of $3.8 billion. The second largest, Time Warner, had 6.8 million subscribers and total revenue from all sources of $12 billion. *Id.* at ¶ 31.

Despite Congressional efforts to promote competition in the cable industry, the provision of cable television has remained a monopoly service in virtually every community. In 1991, cable system operators faced competition from another operator in less than 1% of the localities served by cable. *Id.* at ¶ 28.

In Alexandria, the sole provider of cable television service is Jones Intercable, the country's eighth largest MSO. *Id.* at ¶ 32. Cable service is available to over 90% of all television households in Alexandria, and 57% of television households subscribe. *Id.* at ¶ 18. The system deployed in Alexandria has a capacity of 51 channels, and, as of April 1993, Jones Intercable offered a program-

*Finance of the House Comm. on Energy and Commerce,* 102d Cong., 1st Sess. (March 20 and June 26, 1991); *Communications Competitiveness and Infrastructure Modernization Act of 1990: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science, and Transportation,* 101st Cong., 2d Sess. (July 24, 1990); *Cable TV Consumer Protection Act of 1989: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science, and Transportation,* 101st Cong., 2d Sess. (March 29 and April 4, 1990); *Cable Television Regulation: Hearings Before the Subcomm. on Telecommunications and Finance of the House Comm. on Energy and Commerce, (Parts 1 and 2),* 101st Cong., 2d Sess. (March 1, April 19, and

May 9, 1990); *Oversight of Cable TV: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science and Transportation,* 101st Cong., 1st Sess. (November 17, 1989); *Competitive Issues in the Cable Television Industry: Hearings Before the Subcomm. on Antitrust, Monopolies and Business Rights of the Senate Comm. on the Judiciary,* 100th Cong., 2d Sess. (March 17, 1988).

10. *See* H.R. 1504, 103rd Cong., 1st Sess. (1993); S. 1200, 102d Cong., 1st Sess. (1991); H.R. 2546, 102d Cong., 1st Sess. (1991); S. 2800, 101st Cong., 2d Sess. (1990); S. 1068, 101st Cong., 1st Sess. (1989); H.R. 2437, 101st Cong., 1st Sess. (1989).

ming package of 44 channels for $24.65 per month. *Id.* at ¶¶ 21, 34. Plaintiffs note that in nearby Anne Arundel County, Maryland, where Jones Intercable faces competition from another cable service, the company charges only $21.20 per month for a comparable programming package; cable subscribership in Anne Arundel County is over 70%. *Id.* at ¶¶ 34–35.

## II.

■ As a preliminary matter, the government disputes plaintiffs' standing to bring a challenge to § 533(b). Specifically, the government argues that plaintiffs' injury, the inability to provide cable television service within C & P's service area, is neither "traceable" to § 533(b) nor "likely to be redressed" by a decision invalidating § 533(b). This contention is meritless.

In order to establish standing, at an "irreducible constitutional minimum," plaintiffs must show three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized ...; and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'".... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.".... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations omitted). Indisputably, the ban on provision of video programming inflicts a concrete, actual injury on plaintiffs. Moreover, contrary to the government's contention, the injury is also "traceable" to the § 533(b) ban and would be redressed by invalidation of the ban.

At the heart of the government's standing argument is the observation that if § 533(b) were lifted, plaintiffs would not instantly be in a position to provide cable television. In support, the government notes that plaintiffs have obtained neither approval from the Virginia State Corporation Commission nor a franchise from the City of Alexandria to operate a cable television system. Thus, the government contends, plaintiffs' inability to provide cable television is not traceable solely to § 533(b), and invalidation of § 533(b) would not necessarily redress the purported injury that plaintiffs have suffered.

The fallacy of this argument is that it is not an essential precondition of plaintiffs' standing that the challenged statute be the sole obstacle to plaintiffs' achievement of their ultimate goal.[11] The fact that § 533(b) stands as an "absolute barrier" to plaintiffs' efforts to operate a cable television service is sufficient, by itself, to satisfy the traceability requirement. *See Arlington Heights,* 429 U.S. at 261, 97 S.Ct. at 561. Similarly, plaintiffs satisfy the requirement that their injury would be "redressed by a favorable decision," simply because invalidation of the statute would allow plaintiffs to pursue regulatory approval and a municipal franchise on the same footing as any other applicant. *See Regents of University of California v. Bakke,* 438 U.S. 265, 281 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (standing exists for plaintiff unconstitutionally deprived of opportunity to *compete* for a benefit, without proof that, in the absence of the challenged program, plaintiff necessarily would have received the benefit).

It would be both formalistic and wasteful of governmental and societal resources to require, as the government suggests is necessary, that plaintiffs engage in a doomed effort to obtain a municipal franchise and state regulatory approval for their venture,

---

11. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977) (standing exists where challenged statute was "absolute barrier" to plaintiff's goal, despite the fact that invalidation of statute would not "guarantee" achievement of that goal); *see also Nyquist v. Mauclet,* 432 U.S. 1, 6 n. 7, 97 S.Ct. 2120, 2124 n. 7, 53 L.Ed.2d 63 (1977) (unnecessary for plaintiff to apply for and be denied a loan in order to establish his standing to challenge the statute making him ineligible for the loan, "in light of the certainty of [the loan's] denial" under the statutory scheme).

even in the face of a federal statute that expressly forbids them from engaging in the activity in question. The futility of any such undertaking is underscored by the predictable response of the Alexandria city government, which refused, in light of § 533(b), to consider C & P's preliminary efforts to obtain a municipal franchise. *See* Letter of Philip G. Sunderland, City Attorney, City of Alexandria, to J. Howard Middleton, Jr., Hazel & Thomas (Feb. 17, 1993).

In essence, it is the government's position that C & P, a local telephone company, does not have standing to challenge a statute that expressly and exclusively restricts the activities of local telephone companies. Such a contention is manifestly against the thrust of the Supreme Court's decisions on standing,[12] and is therefore rejected. Plaintiffs have proper standing to bring this action.

### III.

### A.

■ The fundamental constitutional question that must be addressed in relation to plaintiffs' First Amendment claim is the appropriate level of judicial scrutiny to be applied to § 533(b). Generally, regulations that are alleged to infringe upon speech protected under the First Amendment are subjected to one of two levels of scrutiny. First, the "strict scrutiny" standard is applicable to content-based regulations. This is the most stringent standard, for "[t]he First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul,* — U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) (internal citations omitted). As a result, "content-based regulations are presumptively invalid." *Id.* A content-based regulation can survive only if the government " 'show[s] that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' "

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,* — U.S. ——, ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (quoting *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987)).

Regulations that are not content-based, but which still infringe upon protected speech may be accorded a lower, "intermediate" level of scrutiny. Thus, the government may, "impose reasonable restrictions on the time, place, or manner of protected speech" without triggering strict scrutiny, provided, *inter alia,* that such restrictions are content-neutral. *Ward v. Rock Against Racism,* 491 U.S. 781, 789–90, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). Similarly, the government may regulate conduct, even when such conduct has an expressive element, provided that it does not "proscribe particular conduct *because* it has expressive elements." *Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989). The Supreme Court has ruled that either type of content-neutral regulation will survive scrutiny under the First Amendment if the provisions in question pass the test first enunciated in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), and refined in later decisions, namely, that the provisions " 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753 (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)); *see also Community for Creative Non–Violence,* 468 U.S. at 298, 104 S.Ct. at 3071 (indicating that the constitutional test for the validity of time, place, or manner restrictions is "in the last analysis . . . little, if any, different from" the test for restrictions on expressive conduct).

---

12. *See, e.g., Lujan,* — U.S. at ——, 112 S.Ct. at 2137 ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

Defendants in this matter forcefully contend that the provisions in question should not be subjected to either of the two forms of heightened review applicable in the First Amendment context. Instead, defendants argue that § 533(b) is an example of "structural" economic regulation, only tangentially related to the First Amendment and, therefore, that § 533(b) should be subjected only to rationality review, that is, that this Court must uphold the provision if it is rationally related to a legitimate government objective. At most, defendants argue, the provision places only an incidental burden on the plaintiffs' First Amendment rights and therefore should be subjected to intermediate scrutiny under the *O'Brien* test.

Plaintiffs reject this view and argue instead that § 533(b) is a direct infringement on their right to speak in a particular forum, thereby directly implicating First Amendment considerations. Moreover, plaintiffs contend that § 533(b) is a content-based restriction on speech and therefore, under Supreme Court precedent, is subject to strict scrutiny. At the least, plaintiffs contend, even if § 533(b) is found to be content-neutral, the incidental burden on plaintiffs' speech necessitates review of the statute under the *O'Brien* test.

Plaintiffs' argument is correct in an important respect; the provision in question must be subjected to a higher standard than mere "rationality review." Section 533(b) directly abridges the plaintiffs' right to express ideas by means of a particular, and significant, mode of communication—video programming. Video programming, as offered by cable operators, has been recognized by the Supreme Court as a form of speech protectible under the First Amendment. *See Leathers v. Medlock*, 499 U.S. 439, ——, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991) ("Cable television ... is engaged in 'speech' under the First Amendment"); *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986) ("[T]hrough original programming or by exercising editorial discretion over which

stations or programs to include in its repertoire, [a cable television operator] seeks to communicate messages on a wide variety of topics and in a wide variety of formats."). As such, a statute that directly abridges the right to engage in this form of speech must be evaluated under the heightened standards that have evolved under the Supreme Court's First Amendment decisions. This is true even when the abridgement is an incidental effect of a statute directed at non-speech activity, such as "structural" economic regulation, if such a statute disproportionately impacts entities engaged in speech protected by the First Amendment. *See, e.g., Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568 (1986).

Defendants' authorities in support of rationality review are all distinguishable. With one exception,[13] the cases cited in support of this position deal with regulations directed at the broadcast media. *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). In each of these cases, the Supreme Court explicitly premised its ruling on the fact that there is a physical scarcity of electromagnetic frequencies available for utilization by prospective broadcasters. *See, e.g., National Broadcasting Co.*, 319 U.S. at 226, 63 S.Ct. at 1014 ("Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation."); *see also Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). In light of the physical scarcity of electromagnetic frequencies, the Supreme Court has accorded Congress greater latitude under the First Amendment to regulate broadcasters than other forms of communication media, to ensure that the "public interest" is served. *See, e.g., National Citizens Committee*, 436 U.S. at 795, 98 S.Ct. at 2112.

**13.** *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), discussed *infra*.

Of course, viewing only the end product, cable television is largely indistinguishable from broadcast television. Yet enormous differences in the technology used to convey the respective forms of communication clearly warrant different treatment of cable television under the First Amendment. *See, e.g., Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) ("Each medium of expression ... must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems."). As the parties have stipulated, "There are no absolute physical barriers to the construction of competing multichannel cable services attributable to the physical scarcity of the electromagnetic spectrum." Joint Stipulations of Fact, ¶ 37. Moreover, while there may, at some point, exist an absolute physical constraint on the number of cables that could be strung along existing utility rights-of-way in order to service individual households, the number of cable operators that could simultaneously service a household is so large as to be infinite for purposes of First Amendment analysis.[14]

The only scarcity argument that defendants could legitimately advance to make the broadcasting cases apposite is that the cable television industry is a natural monopoly and, therefore, that certain economic factors conspire to create a condition of scarcity in the market for cable television analogous to the scarcity imposed on broadcasting by the physical properties of the electromagnetic spectrum. This argument has been foreclosed, however, by the Supreme Court's decision in *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). There, the Supreme Court struck down a state statute requiring a newspaper, under certain circumstances, to publish an editorial reply by a candidate who had been assailed in the newspaper. The statute in question was similar, in its requirement of mandated access, to the Commission's "fair-ness doctrine," applicable to radio broadcasters, which had been upheld in *Red Lion,* 395 U.S. at 367, 89 S.Ct. at 1794. Significantly, the Supreme Court struck down the statute despite accepting the assumption that there had evolved a "monopoly of the means of communication" and citing a study finding that "'[o]ne-newspaper towns have become the rule, with effective competition operating in only 4 percent of our large cities.'" *Tornillo,* 418 U.S. at 249–50 & n. 13, 94 S.Ct. at 2835–36 & n. 13. The clear implication of *Tornillo* is that the principle that allows an increased level of government intervention under conditions of physical scarcity is inapplicable when scarcity results from purely economic forces. As a result, an assertion that the cable television industry is a natural monopoly is insufficient to bring the present case within the ambit of the broadcast cases.[15]

While defendants cannot argue scarcity, they make a related argument, namely that, as beneficiaries of a government-sanctioned monopoly for the provision of local wireline telephone exchange services, plaintiffs may have their right to continued status as a monopoly subjected to certain conditions imposed by the government. It is permissible, defendants contend, that among those conditions the government require that the plaintiffs refrain from providing video programming to customers within their service areas. Defendants argue that, in effect, plaintiffs have a choice: in any given area, they may provide video programming or local telephone service; they may not do both. Thus, § 533(b) does not absolutely preclude plaintiffs from offering video programming—if they wish to do so, they simply must abandon their local wireline exchange monopoly.

It is unnecessary, in the context of this litigation, to reach the thorny legal question of when, and under what circumstances, the government may condition a benefit upon the beneficiary's relinquishment of a constitu-

---

**14.** *See* Joint Stipulation of Fact, ¶ 40 ("In general, multiple lines of coaxial cable or fiber optics can be placed next to each other without mutual interference to video signals they carry. This means competing cable transmission systems can exist side-by-side without such interference.").

**15.** For a more extensive discussion of the inapplicability of the scarcity doctrine to regulation of cable television, see *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 43–46 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

920

tional right.[16] Section 533(b) is simply not part of a *quid pro quo* exchange in which the telephone companies were offered the opportunity· to operate a monopoly service in return for accepting restrictions on their First Amendment rights. To be sure, "the BOCs [Bell Operating Companies] have monopolies over local telephone exchange service in their respective service areas." *United States v. Western Electric Co.*, 993 F.2d 1572, 1578 (D.C.Cir.1993). Similarly, there is no question that in this jurisdiction, as in most others, the state government has taken actions to preserve the local exchange monopoly of the BOC.[17] Even so, defendants' *quid pro quo* argument is unpersuasive.

First, the sovereign which purportedly provided the benefit to the plaintiffs is not the same sovereign that placed the condition on the benefit. As noted above, it is the Commonwealth of Virginia that has legislated in support of the plaintiffs' local exchange monopoly. In no way can defendants persuasively argue that the federal government has sanctioned plaintiffs' monopoly. Far from it, the record reflects vigorous steps by the federal government to minimize the anticompetitive consequences of the local exchange monopoly.[18] Having provided no benefit to plaintiffs, the federal government cannot be heard to argue that, by restricting the plaintiffs' First Amendment rights, it has merely placed a condition on a benefit it has granted. *C.f. First National Bank of Boston v. Bellotti*, 435 U.S. 765, 778–79 n. 14, 98 S.Ct. 1407, 1416–17 n. 14, 55 L.Ed.2d 707 (1978) (restriction imposed by one sovereign

16. *Compare, e.g., Buckley v. Valeo*, 424 U.S. 1, 57 & n. 65, 96 S.Ct. 612, 653 & n. 65, 46 L.Ed.2d 659 (1976) (indicating that law imposing campaign spending limits was unconstitutional abridgement of a candidate's freedom of speech, but that Congress could condition the candidate's acceptance of public financing on an agreement to abide by such spending limits) *with, e.g., Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."). *See also Rust v. Sullivan*, — U.S. —, ——, 111 S.Ct. 1759, 1774–76, 114 L.Ed.2d 233. This area of the law has spawned a great deal of academic interest. *See, e.g.,* David Cole, *Beyond Unconstitutional Conditions: Charting Spheres of Neutrality in Government Funded Speech*, 67 N.Y.U.L.Rev. 675 (1992); Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv.L.Rev. 1415 (1989).

17. *See* Virginia Code § 56–265.4:4(A) ("No certificate shall be granted to an applicant proposing to furnish local exchange telephone service in the territory of another certificate holder unless and until it shall be proved to the satisfaction of the Commission that the service rendered by such certificate holder in such territory is inadequate to the requirements of the public necessity and convenience. If the Commission shall be of the opinion that the service rendered by the existing certificate holder in such territory is in any respect inadequate to the requirements of the public necessity and convenience, that certificate holder shall be given reasonable time and opportunity to remedy the inadequacy before any cer-

tificate shall be granted to an applicant proposing to operate in that territory.").

18. In this regard, plaintiffs point to recent technological advances, encouraged by the FCC, which have provided individuals with increasing opportunities to utilize communication methods that would bypass the BOCs' exchange networks. Examples include the establishment of Competitive Access Providers employing fiber-optic or microwave technologies, the licensing of increasing numbers of cellular phone service providers, and the experimental licensing of additional radio-based telephone providers offering personal communication services. *See* Joint Stipulation of Facts, ¶¶ 47, 53, 55. Even more indicative of the federal government's antipathy toward the BOCs' monopoly of local exchange services is the AT & T consent decree litigation, brought by the Department of Justice, which resulted in the divestiture by AT & T of the BOCs. Contrary to the defendants' contention that the Modified Final Judgment ("MFJ") entered by Judge Greene in *United States v. American Telephone & Telegraph Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), signals the federal government's complicity in the existence of the BOCs' monopoly, the "very purpose" of the MFJ was to prevent the operator of the local exchange monopoly (which, prior to the litigation, was AT & T) from leveraging its monopoly into other, potentially competitive, markets in the communications industry—most significantly, the interexchange (long distance) transportation of communication services. *Id.* at 188. Judge Greene explicitly recognized, and approved of, the fact that evolving technology would likely result in an eventual challenge to the BOCs' monopoly of local exchange services. *Id.* at 175.

cannot be justified by grant of benefit by different sovereign).

Nor was § 533(b) a condition of plaintiffs accepting the local exchange monopoly. The state government sanctioned plaintiffs regulated monopoly long before, and for reasons unrelated to, the federal government's passage of § 533(b). In no way is there a *quid pro quo* relationship between § 533(b) and the local exchange monopoly.

Besides, the Supreme Court has given no indication that any government's grant of monopoly status to an entity is sufficient to allow it to restrict that entity's First Amendment rights. Indeed, its decisions suggest the contrary. *See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 568, 100 S.Ct. 2343, 2352, 65 L.Ed.2d 341 (1980) ("appellant's monopoly position does not alter the First Amendment's protection for its commercial speech"); *Consolidated Edison Co. v. Public Service Commission of New York*, 447 U.S. 530, 534 n. 1, 100 S.Ct. 2326, 2331 n. 1, 65 L.Ed.2d 319 (1980) ("Nor does [appellant's] status as a privately owned but government regulated monopoly preclude its assertion of First Amendment rights."). Taken to its logical extreme, defendants' argument would mean that because state governments have chosen to confer certain advantages on businesses that opt to incorporate, any corporate speaker is, as a beneficiary of those advantages, subject to having conditions placed on its right to free speech. This proposition has flatly been rejected by the Supreme Court. *See Bellotti*, 435 U.S. at 778–79 n. 14, 98 S.Ct. at 1416–17 n. 14. Accordingly, this Court rejects defendants' argument that § 533(b) may be characterized as a *quid pro quo* exchange of monopoly benefits in return for acceptance of First Amendment restrictions and, therefore, that the provision need only be accorded rationality review.

The last case defendants cite in support of rationality review is *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). In that case, the Supreme Court upheld the application of the antitrust laws to enjoin members of the Associated Press from a concerted refusal to deal with non-members of the organization. In addressing the First Amendment implications of the decision, the Supreme Court declined to apply any heightened form of scrutiny to the application of the antitrust statutes, despite the fact that the decision compelled the members of the Associated Press to share access to their news stories and thus, arguably, to "speak" in a manner contrary to their wishes. *Id.* at 19–20, 65 S.Ct. at 1424–25.

*Associated Press* stands only for the proposition, confirmed in numerous other decisions, that the media may be subjected to economic regulations that are generally applicable to all industries without triggering heightened review of such regulations under the First Amendment. *See, e.g., Oklahoma Press Publishing Co. v, Walling*, 327 U.S. 186, 192–93, 66 S.Ct. 494, 497, 90 L.Ed. 614 (1946) (application of Fair Labor Standards Act); *Associated Press v. NLRB*, 301 U.S. 103, 132–33, 57 S.Ct. 650, 655–56, 81 L.Ed. 953 (1937) (application of National Labor Relations Act). The Supreme Court has made clear, however, that this line of cases does not mean that economic regulation is subject only to rationality review regardless of the degree to which the regulation impinges on an entity's First Amendment activity. To the contrary, *O'Brien* and its progeny have plainly held that heightened scrutiny will be applied to those governmental actions that have a significant, disproportionate, impact on expressive conduct, even if such impact is only an incidental effect of the statute. *See, e.g., Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1371–72, 75 L.Ed.2d 295 (1983) ("differential treatment ... of the press" implicates the First Amendment and is "presumptively unconstitutional").

Section 533(b) is not a generally applicable statute; it applies to a sharply limited number of entities—companies providing local telephone exchange services. Moreover, § 533(b) achieves its aim by means of a direct abridgement of the telephone companies' right to participate in a protected form of speech. This is centrally significant, for the Supreme Court has never accorded mere

rationality review to a statute, even a "structural" economic regulation, that, on its face, prohibited a specific category of speakers from engaging in a protected form of speech. *C.f. Arcara*, 478 U.S. at 697, 106 S.Ct. at 3172 (refusing to apply heightened First Amendment review to statute that incidentally burdened First Amendment rights but was not expressly "directed" at communicative activity). In light of *O'Brien* and its progeny, § 533(b) must plainly be evaluated on a standard higher than mere "rationality" review.

### B.

At first glance, it would appear virtually certain that a statute restricting telephone companies from providing video programming to customers within their service areas would fall within one of the two content-neutral categories, either as: (1) a time, place, and manner restriction on the form of the telephone companies' speech [19] or (2) an economic regulation directed at non-speech conduct, but inflicting a substantial, and disproportionate, incidental effect on the telephone companies' right to engage in expressive activity. After all, had Congress chosen to prohibit telephone companies from transmitting any visual image, the resulting statute would almost certainly be content-neutral, and there would be no persuasive argument that such a statute would be subject to strict scrutiny.[20] Yet, analysis cannot end here for § 533(b), as written and enacted, requires reference to the content of the relevant message in order to determine whether a particular visual image qualifies under the

**19.** Plaintiffs argue that § 533(b) cannot properly be viewed as a "time, place, or manner restriction" because the statute precludes them entirely from reaching a specific audience by use of a specific means of communication. This argument has no merit. Plaintiffs greatly overstate the blanketing effect of the restriction placed upon them. Plaintiffs may provide video programming to audiences outside their service area, and may speak through any type of non-video medium to audiences inside their service area. Even more significantly, however, plaintiffs may also reach audiences within their service area with video programming. Section 533(b) only prohibits plaintiffs from *directly* providing video programming to their subscribers. Plaintiffs are not prohibited from producing their own video programming and marketing it to broadcasters or cable operators for transmission by means other than the plaintiffs' own facilities. Public access requirements ensure that such programming cannot be silenced by the entities responsible for the direct provision of video programming. Clearly, then, § 533(b) operates only as a restriction on the "manner" in which plaintiffs may speak, not as an outright ban on their ability to do so.

**20.** The Court rejects plaintiffs' contention that § 533(b) should be subjected to strict scrutiny solely because it singles out a particular class of speaker, the telephone companies and their affiliates, for unfavorable treatment. Strict scrutiny is not applicable to a statute which targets a particular class of speaker, provided that class is sufficiently large, unless the statute also discriminates based on the content of the speech. *See Leathers*, 499 U.S. at ——, 111 S.Ct. at 1446 ("a differential burden on speakers is insufficient by itself to raise First Amendment concerns"); *Turner Broadcasting System, Inc. v. FCC*, 819 F.Supp. 32, 42 (D.D.C.1993) (" 'Speaker-partial' regulations, or those that purportedly favor one group of speakers at the expense of others ... are not subject to strict scrutiny unless they are content-based."), *appeal pending*. To the extent that the Fourth Circuit's opinion in *Henrico Professional Firefighters Association v. Board of Supervisors*, 649 F.2d 237 (4th Cir.1981), can be read to hold that speaker-partiality alone is sufficient to trigger strict scrutiny, that aspect of the opinion has been implicitly overruled by the Supreme Court's decision in *Leathers*.

The Court also rejects plaintiffs' argument that, based on the Supreme Court's decisions in *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) and *Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), there is a separate, and heightened, standard of review applicable when the government seeks to "eliminate an entire category or manner of speech, even on the basis of a content-neutral restriction...." Plaintiffs' Reply Br. at 40. The *Schneider* and *Martin* decisions are best read, not as inaugurating a conceptually separate, and still viable, standard of review, but rather, as foreshadowing the Supreme Court's modern "time, place, and manner" doctrine. Specifically, these cases stand for the proposition, made explicit in cases such as *Ward*, 491 U.S. at 789, 109 S.Ct. at 2753, and *Clark*, 468 U.S. at 293, 104 S.Ct. at 3069, that a "time, place, and manner" restriction will not survive the *O'Brien* test unless the statute preserves ample effective alternative channels for communication. *See Martin*, 319 U.S. at 146, 63 S.Ct. at 865 ("Door to door distribution of circulars is essential to the poorly financed causes of little people."); *Schneider*, 308 U.S. at 164, 60 S.Ct. at 152 ("[P]amphlets have proved most effective instruments in the dissemination of opinion.... [Interference with] the free and unhampered distribution of pamphlets strikes at the very heart of the constitutional guarantees.").

statutory definition of "video programming." This circumstance substantially complicates the analysis concerning whether § 533(b) is a content-based or content-neutral regulation.

The 1984 Cable Act defines "video programming" as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. § 522(19). The parties do not dispute that § 533(b) permits the telephone companies to transmit visual images such as the face of a clock reflecting the current time, or the image of a person speaking to the viewer by picture-phone. Such images are permissible under the statute because they are not comparable to programming that was provided by a television broadcast station in 1984.[21] A moment's reflection makes it readily apparent that the cognitive process necessary to apply the video programming definition cannot be accomplished without comparing the content of the image being tested with the content of 1984 broadcast television programming. Despite defendants' protestations to the contrary, there is simply no way that § 533(b), incorporating as it does the § 522(19) definition, can be applied without reference to the content of the message being conveyed.[22]

The line between permissible visual images and impermissible "video programming" has become increasingly blurred with the advance of technology. This is nowhere more evident than in the Commission's most recent interpretation regarding the scope of the § 533(b) ban, the Video Dialtone Order. *See* 7 FCC Rcd. at 5781. In that action, the Commission modified its rules to allow telephone companies to provide a package of video services known as "video dialtone." The Commission found that its action did not violate § 533(b) because the video services included within the video dialtone package did not meet the statutory definition of "video programming." In "clarifying" its interpretation of the scope of § 533(b), the Commission presented the following example:

> We ... conclude that programming that includes multimedia graphics and information services that incorporate video images generally would not be video programming because the video images are not severable from the program service.... For instance, an educational multimedia presentation which may contain video images would be permissible under our interpretation.... We do not contemplate, however, that the simple inclusion of some textual information, for example, could transform a severable video program into a permissible multimedia program.

Video Dialtone Order, 7 FCC Rcd. at 5822 & n. 196. Fortunately, the Court is not called upon to interpret or apply this language. Apparently, the Commission will allow telephone companies to transmit presentations that are primarily textual, and include some video segments, but will prohibit presentations that are primarily video, and include some textual segments. Irrespective of

---

**21.** The Commission has ruled that the standard is not an evolving one, dependent on the innovations in broadcast television programming, but rather that the standard must be interpreted with reference to the content of broadcast television at the time of the passage of the statute. *See* Video Dialtone Order, 7 FCC Rcd. at 5820. The parties have not challenged this interpretation, nor suggested any reason why the interpretation is unreasonable, so the Court defers to the Commission's interpretation in accordance with the principle set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

**22.** Illustrative of this point is the following colloquy between the Court and government counsel at the hearing on the cross-motions for summary judgment:

> THE COURT: Let's suppose it [the statute] says telephone companies can't send television programming, but they can send [The McNeil/Lehrer Newshour]. Would that be constitutional?
>
> MS. WILSON: No, it would not be constitutional....
>
> THE COURT: Well, let me go on.... Let's suppose then it says ... you may not send the news programs and you may not send sitcoms. That wouldn't pass muster either, would it?
>
> MS. WILSON: That's right.
>
> THE COURT: And I guess you can see I can give you a list of what's on television in 1984.... If you got out the T.V. Guide for 1984 you could end up with a generic list of all the stuff that's on television. And, why wouldn't that then also not pass muster? ... What's the difference [between that and the statutory definition of "video programming"]?
>
> Tr. at 45–47.

whether this is a workable line of demarcation, the example is noteworthy because it shows that the Commission's interpretation is inescapably premised on the content of the relevant transmission.[23]

Notwithstanding the fact that application of § 533(b) depends on the content of the telephone companies' proposed message, the section cannot, under recent Supreme Court precedent, be considered a content-based restriction. Recent decisions have made clear that "strict scrutiny" is not triggered because *application* of a speech restriction is dependent on the content of the speech. Rather, "[g]overnment regulation of expressive activity is content-neutral [and therefore not subject to strict scrutiny] so long as it is *'justified* without reference to the content of the regulated speech.'" *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754 (quoting *Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069) (emphasis added by the *Ward* opinion). "The government's purpose is the controlling consideration." *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754.

The import of this distinction was made apparent in *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), in which the Supreme Court was faced with a municipal ordinance imposing zoning limitations on the location of "adult theaters." The applicability of the ordinance in that case to any specific theater clearly turned on an evaluation of the content of the films exhibited at that theater. Nevertheless, the Court refused to apply strict scrutiny to the ordinance, holding that the ordinance had been *justified* as a means of preventing various "secondary effects" of adult theaters, such as crime, devaluation of adjacent properties, and alienation of retail establishments, and that such justification was

"unrelated to the suppression of free expression." *Id.* 475 U.S. at 48, 106 S.Ct. at 929.

Similarly, the government in this case has advanced two justifications for the § 533(b) ban that are unrelated to the suppression of free expression: (1) protecting diversity of ownership of communications outlets and (2) promoting competition in the video programming market. Thus, in this case, as in *Renton,* a speech restriction that makes a facial distinction based on content is justified by the government on the basis of certain secondary effects of that speech. Here, as in *Renton,* the government admittedly seeks to restrict speech, on the ground that the prevention of these secondary effects will be advanced by the restriction. If applied here, *Renton* would allow § 533 to escape strict scrutiny and to be subject instead to the less rigorous "intermediate" level of scrutiny prescribed by *O'Brien.* Before proceeding with the analysis, an important objection to *Renton* must be addressed.

*Renton* signals a significant retreat from the traditional content-based/content-neutral distinction. The notion that a legislative act curtailing First Amendment rights is to be evaluated based on its justification rather than on its operation is more than a little troubling. The theoretical underpinning of the content-based/content-neutral distinction in First Amendment jurisprudence has been an awareness that content-based restrictions, whatever their ostensible justifications, afford legislatures increased opportunities to elevate one viewpoint over another. *See* Geoffrey R. Stone, *Content–Neutral Restrictions,* 54 U.Chi.L.Rev. 46 (1987). Moreover, the distinction is grounded in the notion that courts cannot consistently recognize when a content-based restriction will have the effect of fostering or penalizing a particular viewpoint, or when the legislature's asserted "sec-

---

**23.** Contrary to defendants' assertions, the present case is clearly distinguishable from *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), in which the Supreme Court found content-neutral a federal statute requiring all reproductions of United States currency to be in black and white and to be smaller than three-fourths or larger than one and one-half the size of the original. In that case, the Supreme Court found that "the Government does not need to evaluate the nature of the message being impart-

ed in order to enforce the color and size limitations." *Id.* at 656, 104 S.Ct. at 3271. This case is different; application of § 533(b) does not involve a simple comparison of sizes or colors. Even if the FCC purported to propound a precise line of demarcation (*i.e.* over 50% "video programming" would bring a multimedia presentation within the scope of the statute), determination of which images were video and which were not would still inescapably involve content-based judgments.

ondary effect" justification is disingenuous.[24] Thus, any speech restriction, the application of which depends on the message's content, has traditionally, and appropriately, been treated with suspicion by the courts as a potential vehicle for the conscious or unconscious prejudices of the legislature. *See Boos v. Barry*, 485 U.S. 312, 336–37, 108 S.Ct. 1157, 1171–72, 99 L.Ed.2d 333 (1988) (Brennan, J. concurring in the judgment) ("[T]he best protection against governmental attempts to squelch opposition has never lain in our ability to assess the purity of legislative motive but rather in the requirement that the government act through content-neutral means that restrict expression that government favors as well as expression it disfavors.").

The Supreme Court's recent reliance, in cases such as *Renton*, on a legislature's justification of a statute, rather than on the means by which the statute achieves its ends, preserves the form of the content-neutral/content-based distinction, but guts it of its potency. The *Renton* "secondary effects" doctrine abandons the healthy mistrust of the judiciary's ability to detect viewpoint distorting effects of content-based regulations in favor of a misplaced confidence that either: (a) legislatures will always acknowledge any viewpoint distortion likely to result from a regulation or (b) courts will consistently be able to predict which content-based regulations will be devoid of distorting effects. This approach is not likely to be adequately protective of First Amendment values. *See id.* 485 U.S. at 336, 108 S.Ct. at 1172 ("[T]he inherently ill-defined nature of the *Renton* analysis certainly exacerbates the risk that many laws designed to suppress disfavored speech will go undetected.").

*Renton* remains the only case to date in which a majority of the Supreme Court has found that the government's asserted content-neutral justification for a statute can overcome the fact that the statute, on its face, has drawn a content-based distinction.

This lends some force to the plaintiffs' contention that *Renton* should be viewed as an isolated decision, applicable only in the context of sexually explicit speech.

The problem with this argument is that the Supreme Court, just last term, had an opportunity to limit *Renton* in such a fashion, and refused to do so. In *City of Cincinnati v. Discovery Network, Inc.*, — U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court was faced with a municipal ordinance that banned newsracks purveying commercial publications from being placed on public property. In *Discovery Network*, as in *Renton* and the present case, the applicability of the relevant ordinance turned on a content-based distinction—in that case, between commercial and non-commercial publications. Cincinnati attempted to rationalize its ordinance, as in *Renton* and the present case, with content-neutral justifications—in that case, safety and aesthetics. In striking down the ordinance, the Supreme Court distinguished *Renton* by stating, "In contrast to the speech at issue in *Renton*, there are no secondary effects attributable to respondent publishers' newsracks that distinguish them from the newsracks Cincinnati permits to remain on its sidewalks." *Discovery Network*, — U.S. at ——, 113 S.Ct. at 1517. Another section of the majority's opinion states, "[W]e do not reach the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial newsracks. We simply hold that on this record Cincinnati has failed to make such a showing." *Id.* — U.S. at ——, 113 S.Ct. at 1516. Thus, the opinion invites the inference that, had the city placed in the record some showing of differing effects attributable to the commercial newsracks, *i.e.* that people were more prone to litter with the commercial publications or that the commercial newsracks were bigger, flashier, or in some way a greater eyesore, then the *Renton* analysis would have

---

**24.** *See Burson v. Freeman*, — U.S. ——, —— – ——, 112 S.Ct. 1846, 1858–59, 119 L.Ed.2d 5 (1992) (Kennedy, J. concurring) ("Discerning the justification for a restriction of expression, however, is not always ... straightforward.... In some cases, a censorial justification will not be apparent from the face of a regulation which draws distinctions based on content, and the government will tender a plausible justification unrelated to the suppression of speech or ideas.").

been applicable and the ordinance might have been upheld. *Discovery Network* is significant, therefore, as an indication that the Court does not view *Renton* as an aberrant decision or the "secondary effects" theory as a limited principle, applicable only to sexually explicit speech. *See also Boos*, 485 U.S. at 312, 108 S.Ct. at 1157–58 (plurality of justices indicate willingness to apply *Renton* analysis to political speech). This apparent general applicability of *Renton* compels the holding here that § 533(b) is a content-neutral restriction, despite the fact that the determination of whether the statute applies to any particular message may only be accomplished by reference to the content of that message. The two interests advanced by the government in support of § 533(b), diversity in the ownership of communications outlets and competition in the video programming market, are, in the same sense as the secondary effects in *Renton*, justifications which are made "without reference to the content of the regulated speech." *Ward*, 491 U.S. 781, 782, 109 S.Ct. 2746, 2748.

While plaintiffs argue that the statute achieves its ends only by the suppression of speech, and thus that the asserted "secondary effects" justification is itself impermissible, *see Buckley*, 424 U.S. at 48–49, 96 S.Ct. at 648–49 (government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others"), this argument is, on closer scrutiny, tautological. *Renton* only applies to statutes that restrict speech. Thus any statute analyzed under the *Renton*-type analysis will necessarily achieve its goal of regulating "secondary effects" by means of the suppression of speech. To invalidate a statute simply because the regulation of "secondary effects" is achieved by restricting speech would lead to the result that every statute analyzed under *Renton* would invariably be struck down. *Renton* itself proves that is not the law.

For the foregoing reasons, it follows that, while § 533(b) must be subjected to heightened review as a restriction on plaintiffs' First Amendment rights, it does not warrant the strictest standard of review reserved for content-based restrictions on speech. The fact that § 533(b) is "justified" on grounds unrelated to the suppression of the speech means, notwithstanding this Court's misgivings about the *Renton* reasoning, that the statute must be classified as content-neutral and subjected to the intermediate level of scrutiny first articulated in *O'Brien* and applicable to both "time, place, and manner restrictions" and to incidental burdens on speech.

### IV.

■ *Ward* teaches that a statute will pass the intermediate level of scrutiny if, in addition to being content neutral, it: (1) is narrowly tailored to serve a significant government interest and (2) leaves open ample alternative channels for communication. *See Ward*, 491 U.S. at 789, 109 S.Ct. at 2753. With respect to § 533(b), there is little doubt that the statute leaves open ample alternative channels for communication. As discussed above, plaintiffs remain unfettered in their ability to communicate by any means other than video programming. Moreover, plaintiffs may directly provide video programming to anyone residing outside their area of service. Finally, plaintiffs may communicate with subscribers inside their service area through video programming by producing such programming and marketing it to broadcasters and cable operators. Plaintiffs are by no means "silenced" by the operation of § 533(b).

■ Given this, the Court must determine whether § 533(b) is "narrowly tailored to serve a significant governmental interest." As the history of § 533(b) makes clear, the rapidly changing nature of the telecommunications field has caused the rationale supporting the statute to evolve over time. Congress' precise intent in passing § 533(b) in 1984 is made difficult to discern both by the paucity of legislative materials and by the fact that Congress' sole expression of intent—to "codify current FCC rules"—occurred at a time when the Commission's rationale for its own rules was in a state of flux. *Compare* 1970 Order, 21 F.C.C.2d at 324 (stressing pole access concerns) *with* OPP Report at 153–65 (emphasizing threat of cross-subsidization). It is not necessary to

the present inquiry, however, to parse the record of Commission proceedings and concomitant Congressional statements in order to determine precisely which of the Commission's concerns Congress was seeking to vindicate by passage of § 533(b). For purposes of applying the *O'Brien* test, a reviewing court "must eschew altogether the 'guesswork' of speculating about the motives of lawmakers.... Rather, [the court] must look to the face of the regulation and the identifiable interests advanced to justify the regulation." *11126 Baltimore Blvd. v. Prince George's County,* 886 F.2d 1415, 1426 (4th Cir.1989), *vacated on other grounds,* 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990); *see also Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 829 (4th Cir.1979), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). As such, § 533(b)'s evolving rationale is non-problematical. Regardless of what rationale may have been offered for § 533(b) at the time of its passage, if, as conditions exist today, the government can assert a justification for the statute such that the statute is "narrowly tailored to serve a significant government interest," then the statute must be upheld.

The government contends that § 533(b) serves two separate, but related, interests: promoting competition in the video programming market and preserving diversity in the ownership of communications media. Upon reflection, however, these concerns can be seen to collapse into a single interest. Section 533(b) simply does not, in a direct fashion, promote competition in the video programming market. As the cable television industry currently exists in the United States, the transport of video programming is a monopoly service. *See* Joint Stipulation of Facts ¶ 28 ("Of the approximately 10,000 communities served by cable, as of 1991, 53 communities had more than one competing cable system in the same locality."). Section 533(b), which serves to bar entry into the market for video transport service by the one class of potential competitors that has exhibited an inclination to compete with the entrenched monopolists, clearly operates in the first instance to restrict competition in the market for video programming by limiting the number of outlets through which such programming can be distributed. Thus, on the most elemental level, § 533(b) actually reduces competition, both in the market for video transport services and the market for video programming.

It is only by concentrating on the government's other asserted justification, protecting diversity of ownership of communications outlets, that any pro-competitive consequences of § 533(b) can be discerned. In essence, the government contends that the telephone companies would be *too* successful if they were allowed to compete in the cable television market. According to the government, without a prophylactic rule keeping them out of the industry altogether, the telephone companies would face irresistible incentives to undertake anti-competitive actions to drive the cable operators out of business. If the telephone companies were allowed to succeed, the resulting situation would be worse for consumers than the *status quo* because rather than having two monopolists—one providing cable television and related services and one providing local telephone exchange service and related services—consumers would be faced with a single monopolist, the telephone company, providing all of their telecommunication services. In addition to its desire to preserve the economic benefit of competition between the monopolists for the provision of services outside their "core" monopoly service, the government is also justifiably concerned with the implications of having a single entity in control of *all* electronic communication sources entering an individual's home. Thus, the government asserts, to preserve diversity of ownership of communications outlets, telephone companies must be prevented from entry into the cable television industry.[25]

---

**25.** The government has identified two potential anti-competitive practices that the telephone companies would allegedly have incentive to undertake in the absence of the § 533(b) ban: (1) discrimination in the provision of access to telephone poles and (2) cross-subsidization. It is important to note that the practice of cross-subsidization would have significant negative consequences, such as higher costs to local telephone service ratepayers and misallocation of telephone company resources, regardless of whether the telephone companies were able to

Without question, the preservation of diversity of ownership of communications outlets is a significant governmental interest. *See NCCB*, 436 U.S. at 801–02, 98 S.Ct. at 2115–16 (challenged regulations "are a reasonable means of promoting the public interest in diversified mass communications"); *National Association of Broadcasters v. FCC*, 740 F.2d 1190, 1206 (D.C.Cir.1984) ("Traditionally, the FCC has considered diversification of media ownership to be an important objective of federal communications regulatory policy."). Thus, the sole remaining question under the *O'Brien* test is whether § 533(b) is narrowly tailored to serve that interest.

As the *Ward* decision makes clear, in the context of intermediate review under *O'Brien*, the remedy chosen by Congress "need not be the least-restrictive or least-intrusive means" of achieving Congress' goal. 491 U.S. at 796–99, 109 S.Ct. at 2757–58. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* 491 U.S. at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906–07, 86 L.Ed.2d 536 (1985)). The regulation in question may not, however, "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* As the Court explained in *Discovery Network*:

> A regulation need not be "absolutely the least severe that will achieve the desired end," but if there are numerous and obvious less-burdensome alternatives to the restriction ... that is certainly a relevant consideration in determining whether the

"fit" between ends and means is reasonable.

— U.S. at —— n. 13, 113 S.Ct. at 1510 n. 13 (quoting *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d 388 (1989)) (internal citation omitted).[26]

There is no more draconian approach to solving the problem of potential anti-competitive practices by telephone companies in the cable television industry than a complete bar on their entry into that industry. In theory, at least, there are a wide range of less restrictive alternatives that Congress and the Commission could have chosen to pursue that would have allowed telephone companies to enter the cable television market, while constraining, through specific legislation or regulatory scrutiny, their power to drive other cable operators out of the industry. If a number of such alternatives are found to be effective means of eliminating the threats at which § 533(b) is targeted, then the statute certainly is not "narrowly tailored." In short, if there exists a range of regulatory strategies that would effectively eliminate the threat of anti-competitive conduct by the telephone companies in the cable television industry, then § 533(b) would "burden substantially more speech than is necessary to further the government's legitimate interests," and would therefore violate the First Amendment.

It is important to note that, in inquiring into the existence of feasible less restrictive alternatives, courts must not substitute their judgment on policy matters for that of Congress. *C.f. Community for Creative Non-Violence*, 468 U.S. at 299, 104 S.Ct. at 3072

---

amass sufficient market power to become monopolists in the video transmission market. Thus, the evil targeted by § 533(b) is not limited to the end result of the telephone companies' predicted anti-competitive practices, but includes also the negative consequences arising from the *process* of attempted monopolization.

**26.** While the language in *Discovery Network* is addressed to the "reasonable fit" requirement applicable to regulation of commercial speech, not the "narrowly tailored" requirement in *Ward*, the Supreme Court has previously noted the essential equivalence of these two formulations. *See Fox*, 492 U.S. at 475–80, 109 S.Ct. at 3032–

35. There is no reason to doubt that the language in *Discovery Network* would be equally applicable to the "narrowly tailored" requirement. *See Arlington County Republican Committee v. Arlington County*, 983 F.2d 587, 594 (4th Cir.1993) (existence of less restrictive means is relevant consideration concerning whether statute is narrowly tailored); *see also Ward*, 491 U.S. at 806, 109 S.Ct. at 2762 (Marshall, J. dissenting) ("If a court cannot engage in [inquiries regarding less restrictive means], I am at a loss to understand how a court can ascertain whether the government has adopted a regulation that burdens substantially more speech than is necessary.").

(reversing Court of Appeals for disagreeing with Park Service over existence of less speech-restrictive alternatives). Certainly, any findings of fact made by Congress concerning the potential effectiveness of Commission regulation of the pole access and cross-subsidization problems would be entitled to substantial deference from the courts. *See Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 103, 93 S.Ct. 2080, 2087, 36 L.Ed.2d 772 (1973).[27] Yet, nowhere in the legislative materials is there any indication that Congress reached a conclusion concerning the effectiveness of less restrictive regulatory measures to combat the potential for anti-competitive practices by the telephone companies in the cable television market. Committee findings are limited to expressions of opinion on the effectiveness of § 533(b), not on the effectiveness of any less restrictive alternatives. Thus, a House Committee Report indicated that § 533(b) would "encourage a diversity of ownership of communications outlets" (H.R.Rep. 934, 98th Cong., 2d Sess. 56 (1984) U.S. Code Cong. & Admin.News 1984, p. 4693), and a more recent Senate Committee Report opined that the § 533(b) ban "enhance[s] competition" (S.Rep. No. 92, 102d Cong., 1st Sess. 18 (1991) U.S. Code Cong. & Admin.News 1992, p. 1150). Yet, no Congressional finding has ever been made concerning whether these goals could be accomplished by means of a less intrusive measure than a complete prophylactic ban.

Defendants contend, in light of the extensive Congressional attention devoted to this issue,[28] that it is appropriate to impute to Congress a finding that all less restrictive alternatives were infeasible. The Court declines this invitation. It cannot be law that, whenever Congress passes a statute infringing on the right to free expression, it will be inferred by reviewing courts that Congress considered and rejected the effectiveness of all less restrictive alternatives. Such a proposition would reduce the "narrowly tailored"

prong of the *O'Brien* test to a nullity. Rather, this court must undertake its own review of the record to determine whether Congress "reasonably *could have*" found that a prophylactic ban was necessary to effectively accomplish Congress' purposes. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 539, 107 S.Ct. 2971, 2982, 97 L.Ed.2d 427 (1987) (emphasis added).

In assessing whether § 533(b) is indeed necessary, it is essential to carefully examine precisely what the statute prevents. Section 533(b) prohibits a telephone company from directly providing video programming to subscribers in its service area. Significantly, the statute has not been interpreted to prohibit a local telephone company from providing video transport services. Thus, a telephone company is permitted to run a cable into a subscriber's home and then to lease channels of communications on that cable to unaffiliated entities, such as cable operators. *See* Joint Stipulation of Facts, ¶¶ 5, 74; *see also* Video Dialtone Order, 7 FCC Rcd. at 5787 & n. 21. The telephone company only runs afoul of the statute by exercising control or discretion over the programming transported over its facilities.

The fact that telephone companies are not precluded under existing law from competing in the market for video transport services is of paramount significance to the outcome of this case. The government's asserted justification for § 533(b), preservation of diversity in the ownership of media outlets, is premised on the fear that telephone companies will engage in pole access discrimination and cross-subsidization in an attempt to monopolize the video transport market. Surprisingly, however, § 533(b) is irrelevant to the telephone companies' ability to undertake such practices. Put another way, the ban imposed by § 533(b) does not fit with its asserted justification.[29]

---

27. Although, obviously, "whatever deference is due legislative findings would not foreclose [the courts'] independent judgment of the facts bearing on an issue of constitutional law...." *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989).

28. *See* n. 9 & n. 10, and accompanying text, *supra.*

29. Defendants have advanced the cross-subsidy argument with greater vigor than the pole access argument. This is understandable, for there is substantial disagreement in the record concern-

Defendants attempt to finesse the mismatch between the effect of § 533(b) and its asserted justification by submitting an affidavit by Bruce M. Owen, former Chief Economist of the Antitrust Division of the United States Department of Justice. In his affidavit, Owen concedes that the telephone companies are already in a position to cross-subsidize video transmission service. But he goes on to argue that:

> telephone companies' incentive to engage in that cross-subsidization is greatly enhanced if telephone companies are also allowed to exploit monopoly control of video transmission by earning excess profits in video programming. Simply put, the removal of § 533(b) would make a video transmission monopoly more valuable to a telephone company.

Reply Affidavit of Bruce M. Owen at 2–3.[30] As is apparent from Owen's affidavit, it is the concern that telephone companies will act anti-competitively in the *video programming* market, not the *video transport* market, that ultimately must provide the justification for § 533(b). Yet all the evidence adduced regarding the difficulty of regulating anti-competitive conduct of the telephone companies relates to difficulties in monitoring their conduct in the video transport business.[31] There is no contention that the telephone companies possess any inherent advantage that would allow them successfully to evade regulation of anti-competitive behavior in the video programming market.[32] Even under the government's worst case scenario, in which the telephone companies succeed in driving out all competition for the provision of video transport service, the telephone companies would be in no better position to act anti-competitively in the video programming market than are the current monopolists in the video transport market, the existing cable operators.

In fact, the potential for telephone companies to act anti-competitively in the video programming market can be reduced to a level significantly below the level of risk currently tolerated in relation to the cable operators. To the extent that the existing legislative and regulatory framework may be viewed as ineffective in curbing anti-competitive actions in the video programming market, more restrictive conditions ˙ may be placed on the provision of video programming by telephone companies. For example, the Commission's current recommendation to Congress for repeal of § 533(b) includes a requirement limiting the telephone company's direct provision of video programming to a specified percentage of the channel capacity made available by the company's video

ing the potential effectiveness of regulatory controls on cross-subsidization, but there is no doubt that, to the extent that the existing Pole Attachment Act does not entirely prevent the possibility of pole access discrimination, effective legislation could be passed to guarantee non-discriminatory access. If discriminatory pole access were the sole concern of Congress in enacting a prophylactic ban on a telephone company's ability to speak through video programming, then such a ban would plainly burden more speech than necessary to further the government's interests.

**30.** *See also* FNOI, 3 FCC Rcd. at 5864 ("Barring carriers from providing video programming in the service areas in which they also control the local exchange networks and facilities on which the delivery of cable programming provided by third parties generally depends surely reduces carrier incentive and ability to engage in anti-competitive conduct in those service areas.").

**31.** *See, e.g.,* Owen Affidavit at 15 ("Local telephone companies have a substantial opportunity to engage in cross-subsidization when, as here, both the competitive video transmission service and the monopoly service are provided on common facilities with common costs.... Common costs mean that cross-subsidization is virtually impossible to detect and eliminate. It is the existence of significant common costs which differentiates telephone companies from [other potentially anti-competitive actors]."); OPP Report at 157 ("One of the most difficult aspects of telephone regulation is the assignment of costs to their causes. Cable and telephone systems share a certain amount of capital equipment; allocating shared costs between these capital accounts on the basis of actual cost causation will be difficult or impossible.") (footnotes omitted).

**32.** *See* Reply Affidavit of Alfred E. Kahn, Professor Emeritus of Political Economy, Cornell University, at 3–4 ("It is difficult to conceive that there could be any substantial costs common to the transmission of video and other telephone signals, on the one side, and the creation and packaging of video programming on the other.... There is therefore no rational connection between the defendants' cross-subsidy argument and the ban against telephone companies providing video *programming*.").

transport facilities. Video Dialtone Order, 7 FCC Rcd. at 5850. The balance of the channel capacity would be required to be leased on a common carrier basis, and the system would be required to have the capability to accommodate multiple video programmers. *Id.,* Such restrictions would eliminate any possibility that a telephone company could extract monopoly profits from the video programming market (even if it succeeded in monopolizing the video transport market) by artificially restricting the aggregate quantity of video programming, thereby inflating the market share of the telephone company's programming affiliate. *See also* Communications Competitiveness and Infrastructure Modernization Act of 1991, S. 1200, H.R. 2546, 102d Cong., 1st Sess., § 653 (1991) (proposing repeal of § 533(b) and 25% capacity limit upon local telephone company provision of video programming).[33]

In sum, this Court need not determine whether the Commission is correct in its assertion that its "existing safeguards ... are sufficient at this time to protect against cross-subsidization...." Video Dialtone Order, 7 FCC Rcd. at 5828. The Court accepts, *arguendo,* the proposition that cross-subsidization is uncontrollable by means of regulatory oversight.[34] The essential point is that telephone companies may already, under existing law, compete in the video transport market, and if it were possible for them to reap supra-competitive profits in that market

through cross-subsidization, the telephone companies could do so irrespective of § 533(b). The only argument defendants can advance to give relevance to § 533(b) as a deterrent of anti-competitive behavior is to contend that the prospect of additional supra-competitive profits from the video programming market may give the telephone companies the needed additional incentive to monopolize the video transport market. This argument fails because there is neither evidence in the record nor any convincing argument to suggest that standard methods of regulation would be ineffective to control anti-competitive activities by the telephone companies in the video programming market. Telephone companies enter the *video programming* market, unlike the *video transport* market, with no inherent advantage that would enable them to evade effective regulation. The federal agencies charged with enforcement of the antitrust laws stand ready to guard against anti-competitive behavior in the video programming market, just as in any other industry.

In light of the fact that effective alternatives exist that would allow telephone companies to enter the cable television market, yet prevent the evils allegedly targeted by § 533(b), the Court finds that § 533(b) is not "narrowly tailored to serve a significant governmental interest," but instead, that the statute "burden[s] substantially more speech

---

**33.** The variety of conceivable measures that would effectively eliminate the potential for a telephone company to exercise market power in the video programming market drives home the point that there is not merely "some imaginable alternative" to § 533(b) "that might be less burdensome on speech," but rather an entire range of effective alternatives that would burden substantially less speech than § 533(b). *C.f. United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906–07, 86 L.Ed.2d 536 (1985).

**34.** A considerable portion of the voluminous record in this case is devoted to the issue of whether cross-subsidization could effectively be eliminated by the scrutiny of the responsible regulatory agencies. Developments such as the expanded use of "price cap" rate regulation of the telephone companies and the Commission's increasing experience in formulating and implementing separation safeguards, *see, e.g. In re Computer III Remand Proceedings: Bell Operating Company Safeguards and Tier 1 Local Exchange Company*

*Safeguards,* 7 FCC Rcd. 7571 (1991), indicate that the regulatory environment is vastly changed since Congress' enactment of the 1984 Cable Act, with the prospects for effective regulatory oversight significantly improved. Yet, the Court cannot, on this record, confidently conclude that changes in the methods of regulation have absolutely eliminated the risk of cross-subsidization. Even the Commission, in recommending the repeal of § 533(b), found, not that cross-subsidization has been rendered impossible, but rather that "any remaining risk of anticompetitive conduct by the local telephone companies is *outweighed* by the potential public interest benefits their entry would bring." Video Dialtone Order, 7 FCC Rcd. at 5849 (emphasis added). Fortunately, in the final analysis the Court need not reach the issue of the potential effectiveness of the regulatory measures, because of § 533(b)'s essential irrelevance with respect to the prevention of cross-subsidization or, in fact, to the prevention of any anti-competitive conduct in the video transport market.

than is necessary to further the government's legitimate interests." The statute therefore fails the test articulated by the Supreme Court in *United States v. O'Brien.*[35]

### V.

For the foregoing reasons, § 533(b) is facially unconstitutional as a violation of plaintiffs' First Amendment right to free expression.[36] An appropriate Order, enjoining enforcement of § 533(b), will issue.

---

**35.** Obviously, if the Court's analysis regarding the appropriate standard of review is flawed, and § 533(b) is properly subject to strict scrutiny, then the provision would fail the "narrowly drawn" element of that test as well. *See Ward,* 491 U.S. at 798 n. 6, 109 S.Ct. at 2758 n. 6. Section 533(b) would also fail strict scrutiny for the independent reason that preservation of diversity in the ownership of communications media is not a sufficiently "compelling state interest" to provide justification for a content-based restriction on speech. *C.f. Burson,* ── U.S. at ──────, 112 S.Ct. at 1857–58 (state's interest in preserving the "fundamental right ... to cast a ballot in an election free from the taint of intimidation and fraud" makes *Burson* "the rare

case in which we have held that a law survives strict scrutiny").

**36.** There is no materially significant fact specific to the provision of cable television in the City of Alexandria, which would serve to distinguish this case from any other projected application of § 533(b). Accordingly, the Court determines that § 533(b) "could never be applied in a valid manner," and thus that plaintiffs have properly brought a facial challenge to the statute. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 796–801, 104 S.Ct. 2118, 2124–27, 80 L.Ed.2d 772 (1984). Obviously, plaintiffs' "as applied" challenge succeeds for the identical reasons.