The SOUTHERN NEW ENGLAND TELEPHONE COMPANY, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

No. 3:94–CV–80 (DJS).

United States District Court, D. Connecticut.

April 28, 1995.

Mark Richard Kravitz, Jeffrey R. Babbin, Wiggin & Dana, Alfred J. Brunetti, Madelyn M. DeMatteo, New Haven, CT, for plaintiffs Southern New England Telephone Co., Inc. and SNET Diversified Group, Inc.

Carl J. Schuman, U.S. Attys. Office, Hartford, CT, Theodore C. Hirt, Christopher P. Tuite, U.S. Dept. of Justice, Civil Div., Federal Programs Branch, Eric Johnson Mahr, U.S. Dept. of Justice, Civil Div., Washington, DC, for defendants U.S., Federal Communications Com'n and Janet Reno, Atty. Gen.

Mark R. Paoletta, O'Connor & Hannan, Washington, DC, for movant Citizens for a Sound Economy Foundation.

Richard S. Order, Updike, Kelly & Spellacy, P.C., Hartford, CT, Stephen S. Ostrach, New England Legal Foundation, Boston, MA, for amici New England Council, Conn. Business and Industry Ass'n.

## MEMORANDUM OPINION

SQUATRITO, District Judge.

### I. INTRODUCTION

This cause is now before the court on the cross-motions for summary judgment filed by Plaintiffs, the Southern New England Telephone Company ("SNET") and SNET Diversified Group, Inc. ("the Diversified Group") and Defendants, the United States of America, the Federal Communications Commission ("FCC"), and Attorney General Janet Reno, in her official capacity (collectively "the Government"), on April 18, 1994 and April 19, 1994,[1] respectively. Documents # 10 & # 16.

Plaintiffs commenced this action on January 19, 1994 seeking a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201 and 2202. They allege that § 613(b) of the Cable Communications Policy Act of 1984 ("the Cable Act" or "the Act"), 47 U.S.C. § 533(b), violates the First Amendment to the United States Constitution.[2] Plaintiffs

1. In an Order dated December 15, 1994, the court converted the Government's motion to dismiss into a motion for summary judgment because it submitted materials outside the pleadings in support of its motion. Fed.R.Civ.P. 12(b)(6). Amici curia briefs were submitted by: Citizens for a Sound Economy Foundation, ADC Telecommunications, Inc., the New England Council and the Connecticut Business and Industry Association.

2. Plaintiffs challenge the statute both on its face and as applied. They also maintain that the provision violates the equal protection guarantee embodied within the Due Process Clause of the Fifth Amendment to the United States Constitution. Because the court finds that the statute violates the First Amendment, it does not address the equal protection argument.

3. The Fourth and Ninth Circuits as well as several district courts have recently addressed the constitutionality of § 533(b) and unanimously concluded that the statute violates the Free Speech Clause of the First Amendment. *US West, Inc. v. United States*, 48 F.3d 1092, 1106 (9th Cir.1995), *aff'g US West, Inc. v. United*

have properly invoked this court's federal question jurisdiction. 28 U.S.C. § 1331.

For the reasons stated below, Plaintiffs' motion is granted and the Government's motion is denied.[3]

## II. BACKGROUND

### A. 47 U.S.C. § 533(b)

In 1984, Congress enacted the Cable Act to "establish a national policy concerning cable communications." 47 U.S.C. § 521(1). *See American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1557–60 (D.C.Cir.1987) (detailing background and purposes of the Cable Act), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). The Act establishes a framework for state and local regulation of cable fees, rates, and service, mandates privacy and consumer protection safeguards for cable systems, and imposes a series of media cross-ownership restrictions.

The Cable Act provides in pertinent part that:

(1) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned

*States*, 855 F.Supp. 1184 (W.D.Wash.1994); *Pacific Telesis Group v. United States*, 48 F.3d 1106, 1107 (9th Cir.1994); *Chesapeake & Potomac Tel. Co. v. United States*, 42 F.3d 181, 185 (4th Cir. 1994) ("*C & P*"), *aff'g Chesapeake & Potomac Tel. Co. v. United States*, 830 F.Supp. 909 (E.D.Va.1993) ("*C & P*"); *Southwestern Bell Corp. v. United States*, Civil Action No. 3:94–CV–193–D, slip op. at 3 (N.D.Tex. Mar. 27, 1995); *United States Tel. Assoc. v. United States*, CA No. 94–1961 (D.D.C. Jan. 27, 1995) (Kessler, J., ruling from the bench); *NYNEX Corp. v. United States*, Civil No. 93–323–C, 1994 WL 779761, at * 2 (D.Me.1994); *Bellsouth Corp. v. United States*, 868 F.Supp. 1335, 1344 (N.D.Ala.1994); *Ameritech Corp. v. United States*, 867 F.Supp. 721, 737 (N.D.Ill.1994). *See also GTE California, Inc. v. FCC*, 39 F.3d 940, 951 (9th Cir.1994) (Noonan, J., dissenting).

To date, the Second Circuit has not addressed this issue. This court, however, finds the opinions of the Fourth and Ninth Circuits as well as those of the several district courts to be well reasoned and believes that the Second Circuit would adopt them.

by, operated by, controlled by, or under common control with the common carrier. (2) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide channels of communication or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the telephone service area of the common carrier.

47 U.S.C. § 533(b). Section 533(b)(3) provides an exception to the ban for telephone companies providing service in rural areas. Furthermore, the FCC has the authority to waive the prohibition under certain circumstances. "Video programming" is defined in 47 U.S.C. § 522(16) as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." The FCC has interpreted § 522(16) to require a comparison of material to be provided by the telephone company with television broadcast programming in 1984.[4] Thus, video services of the type broadcast in 1984 are "video programming" and therefore covered by § 533(b), whereas programming not broadcast in 1984 is not covered by the cross-ownership prohibition.

## B. Regulatory & Legislative History

A detailed discussion of the relevant regulatory history of the cable television industry is contained in *US West*, 855 F.Supp. at 1186–88. To summarize, the telephone-cable cross-ownership prohibition began as a rule adopted by the FCC in 1970, and was prompted by concerns that telephone companies, if permitted to provide cable services in their telephone service areas, would monopo-

lize the field because they would discriminate against independent providers and in favor of their affiliates in granting access to telephone poles and conduits. *US West*, 48 F.3d at 1095–96. A 1981 FCC report suggested that the pole access concerns no longer independently supported the ban, but recommended retaining the cross-ownership restriction due to other concerns, such as potential "cross-subsidization" of telephone companies' cable operations from their monopolistic telephone operations.

As previously discussed, Congress enacted § 533(b) as part of the comprehensive 1984 Cable Act. The Act contains no legislative findings concerning the cross-ownership ban. The only direct reference to the purpose of § 533(b) in the legislative history is a single sentence in a House report, indicating that the provision was intended "to codify current FCC rules concerning the provision of video programming over cable systems by common carriers." H.R.Rep. No. 934, 98th Cong., 2d Sess. 55 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4693. The report also stated that a number of cross-ownership provisions, all codified in § 533, were intended "to prevent the development of local media monopolies, and to encourage a diversity of ownership of communications outlets." *Id.* at 55, *reprinted in* 1984 U.S.C.C.A.N. at 4692.

At the time the FCC's 1970 Order was adopted, the cable industry was in its infancy. In fact, fewer than ten percent of American households had access to cable television. *See First Video Dialtone Order*, 7 FCC Rcd. at 5948. The FCC feared that the telephone companies could easily stifle competition and monopolize the industry. In 1984, when § 533(b) was enacted, the industry had developed significantly, but the fears remained.

Since 1984, however, the nature of the cable television industry has changed enormously.[5] By 1992, access to cable had sur-

---

4. *In re Telephone Company–Cable Television Cross–Ownership Rules (Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking)*, 7 FCC Rcd. 5781, 5820 (1992) ("*First Video Dialtone Order*"); *In re Telephone Company–Cable Television Cross–Ownership Rules (Memorandum Opinion and Order on Reconsideration and Third Further Notice of Proposed Rulemaking)*, CC Docket No.

87–266, FCC 94–269, ¶¶ 109–11 (November 7, 1994) ("*Second Video Dialtone Order*") (affirming *First Video Dialtone Order*'s interpretation of "video programming").

5. For example, the five largest cable system operators in 1992 served over forty percent of all cable subscribers in the entire country. *See C & P*, 830 F.Supp. at 915. In 1991, the largest,

passed ninety-one percent of households. *Id.* at 5855–56. In the Cable Television Consumer Protection and Competition Act of 1992, Congress specifically found that "most cable television subscribers have no opportunity to select between competing cable systems," resulting in "undue market power for the cable operator as compared to that of consumers and video programmers." *US West,* 48 F.3d at 1096 (*quoting* Pub.L. No. 102–385, § 2(a)(2), 106 Stat. 1460, 1460 (1992)) (internal quotation marks omitted). Congress also found that the "cable industry has become highly concentrated" and that the potential effects of such concentration are barriers to entry for new programmers and a reduction in the number of media voices available to consumers. *Id.* (citation and quotation marks omitted).

Although the Government defends the constitutionality of § 533(b) in the case at bar, the FCC, the Antitrust Division of the Justice Department ("DOJ") and the National Telecommunications and Information Administration ("NTIA"), a branch of the United States Department of Commerce, have in the past advocated its repeal.[6] Moreover, in June 1994, the House of Representatives passed a bill which would have repealed § 533(b). The Senate Commerce Committee approved similar legislation, but the measure died when it did not come to a vote in the full Senate before the end of the session.

### C. The Instant Case

SNET and the Diversified Group are both wholly owned subsidiaries of Southern New England Telecommunications Corporation. SNET provides local exchange services to all parts of Connecticut except Woodbury, Southbury, Bethlehem, Greenwich and Old Greenwich. The Diversified Group is an affiliate of SNET as that term is defined in 47 U.S.C. §§ 522(1) and 533(b).

The FCC has authorized local telephone companies to carry the video programming of others over their telephone lines to consumers in their local exchange area, but only on a common carrier basis, providing non-discriminatory access to video programmers unaffiliated with the telephone company. *See Video Dialtone Order,* 7 F.C.C. rcd. 5781. It has, however, prohibited local telephone companies from exercising editorial control over the video programming that is transmitted to their customers. *Id.* at 5817.

In parts of West Hartford, Connecticut, SNET currently transmits to its customers over its own upgraded, fiber optic-coaxial cable network the video programming provided by unaffiliated third parties. SNET has applied to the FCC for an expanded authorization to carry the video programming of unaffiliated third parties in Hartford and Fairfield Counties.

SNET maintains that, if allowed to do so, it would transmit the video programming created by the Diversified Group to its customers. Thus, it filed the instant suit challenging the constitutionality of § 533(b).

### III. STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). It is the substantive law governing the case that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

---

Tele–Communications, Inc., served 9.6 million subscribers and had revenues of $3.8 billion; the second largest, Time Warner, had 6.8 million subscribers and total revenues from all sources of $12 billion. *Id.*

**6.** *See Video Dialtone Order,* 7 FCC Rcd. at 5847, ¶ 135; *In re Telephone Company–Cable Television Cross Ownership Rules,* (*"DOJ Cross–Ownership Rules"*), CC Docket No. 87–266, at 44–45 (Mar. 13, 1992); *The NTIA Infrastructure Report,* 213 (Oct. 1991).

■ In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The inferences to be drawn from the evidence submitted in support of the motion must be viewed in the light most favorable to the party opposing it. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Ramseur,* 865 F.2d at 465.

■ On a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. *Donahue,* 834 F.2d at 58. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate.

## IV. DISCUSSION

The First Amendment provides in pertinent part that "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend I. Because § 533(b) interferes with Plaintiffs' ability to engage in protected speech, the court must determine whether the statute violates the First Amendment. Therefore, the critical issue in the case *sub judice* is what level of scrutiny is appropriate for the review of § 533(b).

The Government contends that § 533(b) is an antitrust measure that only indirectly impacts speech and should be subjected only to rational basis review, or the minimal scrutiny applicable to such economic legislation. On the other hand, Plaintiffs argue that § 533(b) should be subject to the highest level of judicial scrutiny because it discriminates on the basis of the content of the speech as well as between speakers. In the alternative, both the Plaintiffs and the Government maintain that § 533(b) should be subject to intermediate scrutiny.

### A. Minimal Scrutiny

■ The Government raises several arguments in support of the application of minimal scrutiny. None is convincing.

The Supreme Court has clearly recognized that the provision of cable television service is a form of speech protected by the First Amendment. *Turner Broadcasting Sys., Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2451, 129 L.Ed.2d 497 (1994); *Leathers v. Medlock,* 499 U.S. 439, 444, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991). Video programming comprises much of the programming provided by cable television companies. Section 533(b) directly abridges Plaintiffs' right to express themselves by prohibiting them from engaging in video programming. It is not a generally applicable economic law, nor does it address the physically limited airwaves of broadcast television. The antitrust and broadcast cases cited by the Government, therefore, are inapposite. *See* Defendants' Amended Memorandum of Law ("the Government's Brief"), at 19–23.

Moreover, even if the statute was directed at non-speech activity, as the Government contends, it must be subjected to heightened scrutiny because it "impose[s] a disproportionate burden upon those engaged in protected First Amendment activities." *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 704, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568 (1986); *US West,* 855 F.Supp. at 1190–91; *C & P,* 830 F.Supp. at 921–22. Thus, at a minimum, the intermediate level of scrutiny first articulated in *O'Brien* and developed by its progeny is the appropriate standard.

### B. Intermediate Scrutiny

■ Content-neutral restrictions on speech-related conduct or on the time, place or manner of speech are subject to intermediate scrutiny. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672

(1968).[7] Under intermediate scrutiny, a restriction is upheld if: (1) it is content-neutral; (2) it is narrowly tailored to serve a significant governmental interest; and (3) it leaves open ample alternative channels for communication of information. *Id.* When applied to governmental regulations on speech, intermediate scrutiny requires the Government to demonstrate that its asserted interests are real and that the restriction will further those interests in a "direct and material way." *See Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993).

■ Content-neutral restrictions limit expression without regard to the content or communicative impact of the message conveyed. Geoffrey R. Stone, *Content–Neutral Restrictions,* 54 U.Chi.L.Rev. 46, 48 (1987) (quotation marks omitted). Laws that restrict noisy speeches near a hospital, ban billboards in residential communities, limit campaign contributions, or prohibit the mutilation of draft cards are examples of content-neutral restrictions. *Id.*

■ To satisfy the narrowly tailored prong of the test, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985)). In other words, narrow tailoring requires that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. A relevant consideration for a court making this determination is the reasonableness of the "fit" between ends and means. *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993).

## V. ANALYSIS

■ As a threshold matter, in order for intermediate scrutiny to be applied the restriction in question must not be based on the content of speech. At the outset, the court finds that § 533(b) is a content-neutral restriction. *US West,* 48 F.3d at 1100; *C & P,* 42 F.3d at 193–96. Thus, the court turns to a determination of whether the alleged government interests are significant.

The Government contends that there are three goals underlying the enactment of § 533(b): (1) restricting telephone companies from exercising cross-subsidization in the cable medium; (2) prohibiting telephone companies from engaging in pole-access discrimination; and (3) preserving diversity of ownership of communications outlets and of the means of electronic access to homes and businesses. These three goals in fact can be summarized as a single interest, i.e., preventing telephone companies from engaging in anticompetitive behavior. *C & P,* 830 F.Supp. at 927.

■ The court finds this interest to be significant. *US West,* 48 F.3d at 1102; *C & P,* 42 F.3d at 198. In making this determination, *Turner* is highly instructive. With respect to the restraint of unfair trade practices on the part of telephone companies, the Court per Justice Kennedy emphasized that "the government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." *Turner,* —— U.S. at ——, 114 S.Ct. at 2470 (citations omitted). Moreover, with regard to diversity of ownership of communication outlets, Justice Kennedy recognized that "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* Accordingly, the court must now focus on determining whether § 533(b) is "narrowly tailored" to prevent telephone companies from engaging in anticompetitive behavior.

---

**7.** Although the three-part intermediate scrutiny test articulated in *Ward* and *Clark* is somewhat different than the four-pronged version set out in *O'Brien,* the Court has recognized these two tests to be the same. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757.

In determining whether a statute is narrowly tailored, courts generally "afford great weight to the decisions of Congress and the experience of the [FCC]." *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973). This deference, however, is not without its limits. In the context of intermediate scrutiny, this court owes deference to Congress only to the extent that it has made factual findings regarding the need for the particular legislation. *Turner*, —— U.S. at ——, 114 S.Ct. at 2470 ("[R]ecited harms" must be "real, not conjectural."). If there are numerous and obvious less-burdensome alternatives to the restriction, a court will not accede to Congress' judgment. *Discovery Network*, —— U.S. at —— & n. 13, 113 S.Ct. at 1510 & n. 13; *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989). *See Turner*, —— U.S. at ——, 114 S.Ct. at 2471 (Courts retain an "obligation to exercise independent judgment when First Amendment rights are implicated . . . to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence."). It is important to emphasize that, in inquiring into the existence of less restrictive alternatives, courts must not substitute their judgment on policy matters for that of Congress. *Cf. Community for Creative Non–Violence*, 468 U.S. at 299, 104 S.Ct. at 3072.

Although this court cannot second-guess Congress, the instant case requires the court to ascertain what determinations Congress has in fact made regarding § 533(b). As previously discussed, the FCC, the DOJ Antitrust Division and the NTIA have concluded that § 533(b) actually hinders competition, that repeal of § 533(b) would promote competition and that concerns about cross-subsidization can be addressed by federal regulation. *See* n. 4, *supra.* Nonetheless, the Government asks this court to ignore the judgment of the federal agencies responsible for regulating the cable industry and infer from Congress' failure to repeal § 533(b) that it concluded the statute continues to fulfill the goals to which it was dedicated.

The Government's argument is not persuasive. After a thorough review of the record, the court finds that Congress has at no time made any clear, factual determinations regarding whether § 533(b) actually serves the ends for which it was created. The legislative history, to the extent that it is relevant,[8] merely indicates Congress' continuing interest in considering whether to repeal § 533(b). It does not indicate an affirmative finding that there are no less restrictive alternatives. S.Rep. No. 92, 102d Cong., 2d Sess. 18 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1150–51.[9]

In order for the court to conclude that § 533(b) is narrowly tailored, the Government must demonstrate that less restrictive measures would not be effective in restraining the alleged monopolistic tendencies of the telephone companies.[10] There is, however, no convincing evidence in the record that other current methods of regulating anticompetitive behavior would be ineffective. *See C & P*, 830 F.Supp. at 928 ("There is no more draconian approach to solving the problem of potential anticompetitive practices by telephone companies . . . than a complete bar on their entry into th[e] industry.").

Accordingly, the court finds that § 533(b) is not narrowly tailored to serve the Government's substantial interest in preventing anticompetitive practices in the cable televi-

---

8. *Sable Communications*, 492 U.S. at 133, 109 S.Ct. at 2840 (Scalia, J. concurring) ("Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote.").

9. Even if Congress had made findings that § 533(b) serves the goals it was designed to address, this would not eliminate the court's obligation to determine independently whether the statute violates the First Amendment by burdening more speech than is necessary to achieve its goal. *Sable Communications*, 492 U.S. at 129, 109 S.Ct. at 2838.

10. Potential alternative measures include: (1) cost accounting standards to detect cross-subsidization; (2) a complex regulatory framework designed to protect against anticompetitive conduct; and (3) an initial limit on the percentage of channel capacity that the telephone companies may use for their own programming, with the remainder to be leased to other programmers. *FCC Video Dialtone Order*, 7 FCC Rcd. at 5829–30, 5850.

sion industry and is, therefore, unconstitutional.

In light of the court's determination that § 533(b) fails the narrow tailoring requirement, it is unnecessary to decide whether the ability of telephone companies to provide video programming indirectly (via contracting with other cable carriers; to carry other programmers' material) or to engage in video programming outside of their telephone service areas, constitute "ample alternative channels of communication." Moreover, because the court finds that § 533(b) fails to satisfy the narrow tailoring requirement, it is also unnecessary to consider the application of the strict scrutiny test, as the statute would, *a fortiori*, fail the more stringent standard. *C & P*, 42 F.3d at 204 (Michael, J., concurring in part and concurring in judgment) (citation omitted) ("Because the statute cannot even withstand intermediate scrutiny, ... strict scrutiny analysis ... is academic.").[11]

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is hereby GRANTED [Document # 10] and the Government's motion for summary judgment is hereby DENIED [Document # 16]. An appropriate injunction will issue in a contemporaneously filed Order. The Clerk of the court is DIRECTED to close this case.

### *ORDER*

In accordance with the Memorandum Opinion filed contemporaneously herewith, Plaintiffs' motion for summary judgment filed on April 18, 1994 is GRANTED as no genuine issue of material fact exists and Plaintiffs are entitled to judgment as a matter of law. Document # 10. Defendants' motion for summary judgment filed on April 19, 1994 is DENIED. Document # 16.

11. The Government has produced no materially significant fact specific to the provision of cable television in Connecticut that would serve to distinguish this case from any other projected application of § 533(b). Accordingly, the court finds that § 533(b) could never be applied in a valid manner and, therefore, Plaintiffs have prop-

The court ENJOINS Defendants, the United States of America, the Federal Communications Commission and Attorney General Janet Reno, in her official capacity, from enforcing 47 U.S.C. § 533(b) against Plaintiffs, the Southern New England Telephone Company and SNET Diversified Group, Inc. All parties shall bear their own costs. So Ordered.

erly brought a facial challenge to the statute. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796–800, 104 S.Ct. 2118, 2124–26, 80 L.Ed.2d 772 (1984). Furthermore, Plaintiffs' "as applied" challenge succeeds for identical reasons.